Opinions of the Colorado Supreme Court are available to the public and can be accessed through the Judicial Branch's homepage at http://www.courts.state.co.us. Opinions are also posted on the Colorado Bar Association's homepage at http://www.cobar.org.

ADVANCE SHEET HEADNOTE
March 27, 2023

**2023 CO 13**

**No. 21SC533, *Antero Resources v. Airport Land Partners* — Statutory Interpretation — Oil and Gas Conservation Act — COGCC Jurisdiction — Payment-of-Proceeds Disputes.**

In this case, the supreme court considers what constitutes a bona fide dispute over the interpretation of a contract that requires the Colorado Oil and Gas Conservation Commission ("COGCC") to decline jurisdiction under section 34-60-118.5, C.R.S. (2022). The court now concludes that COGCC may not resolve a payment-of-proceeds dispute involving a contract where the parties disagree about the meaning or application of a relevant contract term. COGCC does not have authority to resolve contract disputes on the theory that either the disputed contract terms are unambiguous or settled law compels a certain interpretation because these determinations themselves involve contract interpretation. The court further concludes that COGCC lacks jurisdiction over each of the disputes here. Accordingly, the court affirms the judgment of the division below.

**2023 CO 13**

**Supreme Court Case No. 21SC533**
*Certiorari to the Colorado Court of Appeals*
Court of Appeals Case No. 19CA1799

**Petitioner:**

Antero Resources Corporation,

v.

**Respondents:**

Airport Land Partners, Ltd; Richard N. Casey; Paul Limbach; Nanci Limbach; Fred Limbach; Shidelerosa, LLP; Shideler Energy Company, LLC; Patrick Shuster; Toni Shuster; and Colorado Oil and Gas Conservation Commission.

**Judgment Affirmed**
*en banc*
March 27, 2023

**Attorneys for Petitioner:**
Beatty & Wozniak, P.C.
Karen L. Spaulding
Malinda Morain
Tyler Weidlich
 *Denver, Colorado*

**Attorneys for Respondents Airport Land Partners, Ltd; Richard N. Casey; Paul Limbach; Nanci Limbach; Fred Limbach; Shidelerosa, LLP; Shideler Energy Company, LLC; Patrick Shuster; and Toni Shuster:**
Barton and Burrows, LLC

George A. Barton
Stacy A. Burrows
        *Mission, Kansas*

Connelly Law, LLC
Sean Connelly
        *Denver, Colorado*

**Attorneys for Respondent Colorado Oil and Gas Conservation Commission:**
Philip J. Weiser, Attorney General
Kyle W. Davenport, Senior Assistant Attorney General
Jeff M. Fugate, First Assistant Attorney General
        *Denver, Colorado*

**Attorneys for Amicus Curiae Civitas Resources, Inc.:**
Baker & Hostetler LLP
Alexander K. Obrecht
L. Poe Leggette
Keeley O. Cronin
        *Denver, Colorado*

**Attorneys for Amicus Curiae Colorado Alliance of Mineral and Royalty Owners:**
Koch Law, P.C.
Kelly Shaw
Travis W. Koch
        *Cheyenne, Wyoming*

**JUSTICE HART** delivered the Opinion of the Court, in which **CHIEF JUSTICE BOATRIGHT**, **JUSTICE MÁRQUEZ**, and **JUSTICE GABRIEL** joined. **JUSTICE SAMOUR**, joined by **JUSTICE HOOD** and **JUSTICE BERKENKOTTER**, dissented.

JUSTICE HART delivered the Opinion of the Court.

¶1 It is undisputed that the Colorado Oil and Gas Conservation Commission ("COGCC" or "the Commission") lacks jurisdiction under section 34-60-118.5(5), C.R.S. (2022), to engage in contract interpretation to resolve a bona fide dispute between parties under an oil and gas lease. But what is a "bona fide dispute over the interpretation of a contract"?[1]

¶2 This court has never been asked to consider this question. In 1999, however, a division of the court of appeals concluded that "[t]he statute demonstrates the General Assembly's intent to grant to the Commission jurisdiction only over actions for the timely payment of proceeds and not over disputes with respect to the legal entitlement to proceeds under the terms of a specific royalty agreement." *Grynberg v. Colo. Oil & Gas Conservation Comm'n*, 7 P.3d 1060, 1063 (Colo. App. 1999). From 1999 until 2017, this conclusion appears to have been uniformly accepted by the district courts and was settled law at the court of appeals and

---

[1] We granted certiorari on the following issue:

> Whether the court of appeals erred in finding that either: (1) the mere existence of a disagreement over the extent of Royalty Owners' legal entitlements to further payments under the royalty agreements; or (2) the existence of terms that are "subject to legal debate," constitutes a bona fide dispute over the interpretation of a contract for payment under section 34-60-118.5(5), C.R.S.

COGCC. Indeed, COGCC has never accepted jurisdiction to adjudicate a dispute over contract terms.

¶3 But in 2017, without any intervening change to explain the shift, two district courts changed course, asserting that COGCC had responsibility for resolving contract disputes on the theory either that the contract terms were unambiguous or that settled law compelled a certain interpretation.

¶4 Today we follow the longstanding statutory mandate that COGCC lacks jurisdiction to resolve bona fide disputes of contract interpretation and hold that such a dispute exists where the parties disagree in good faith about the meaning or application of a relevant contract term. Examining the disputes here, we further conclude that each presents a bona fide dispute because the parties have a good faith disagreement over the meaning of contract terms. We therefore affirm the court of appeals' decision that COGCC lacked jurisdiction to resolve the parties' disputes.

## I. Facts and Procedural History

¶5 This matter arises out of disputes between Antero Resources Corporation ("Antero") and Airport Land Partners, Ltd ("Airport Land"); Richard N. Casey; Paul Limbach; Nanci Limbach; Fred Limbach; Shidelerosa, LLP; Shideler Energy Company, LLC; Patrick Shuster; and Toni Shuster (collectively, "Royalty

4

Owners") over whether Antero may deduct certain post-production costs from royalty payments under the applicable leases' royalty clauses.

¶6     Royalty Owners allege that Antero has underpaid royalties in violation of their respective lease contracts.  The various lease agreements between Royalty Owners and Antero address the deduction of costs in three different ways: (1) the lease between Airport Land and Antero (the "Airport Land Lease") is silent as to the deduction of costs from royalty payments and therefore the implied covenant of marketability requires Antero to bear those costs necessary to place gas in a condition acceptable for market; (2) the lease between Richard Casey and Antero (the "Casey Lease") prohibits the deduction of "any and all" costs "except taxes and conservation charges" from royalties, which are paid based on the "market price" of the gas, but provides alternative definitions for "market price" and does not address whether Antero owes royalties on gas used as an in-kind payment to a third party; and (3) the leases between the remaining respondents—Paul, Nanci, and Fred Limbach; Shidelerosa, LLP; Shideler Energy Company, LLC; and Patrick and Toni Shuster (collectively, the "Limbach-Shusters")—and Antero (the "Limbach-Shuster Leases") prohibit the deduction of "all costs of any kind" from royalties, which are paid based on the "value" of the gas, but provides alternative definitions for "value" and does not provide a process to calculate royalties on gas used as an in-kind payment to a third party.

¶7 Royalty Owners filed individual breach-of-contract suits against Antero in Garfield County District Court between December 2016 and April 2017. Antero moved to dismiss the suits, arguing that the claims should have been brought before COGCC in the first instance. The district court granted Antero's motions, finding that Royalty Owners could sue in district court only after exhausting their administrative remedies by giving COGCC the opportunity to determine that it did not have jurisdiction. In so doing, the court rejected the argument that sending Royalty Owners to COGCC would be futile, despite an affidavit from a former COGCC employee stating that it had never accepted jurisdiction to adjudicate a post-production cost deduction claim where there was a contract dispute between the operator and royalty owner. The court further found in each case that the lease at issue was unambiguous and did not require interpretation by COGCC.

¶8 After the dismissal, Royalty Owners brought their claims before COGCC, asking it to determine whether it had jurisdiction. Following a hearing on the matter, COGCC determined that it did not. It based its decision on section 34-60-118.5(5), which provides that COGCC does not have jurisdiction to determine "[t]he amount of the proceeds . . . due a payee by a payer" if the determination involves resolving a "bona fide dispute over the interpretation of a contract for payment." COGCC determined that each of the Royalty Owners'

claims raised a bona fide dispute regarding how the governing lease contract should be interpreted.

¶9 Antero sought judicial review of COGCC's determination in Denver District Court. The district court found that COGCC had jurisdiction because, in its view, the contracts at issue were unambiguous and resolution of the disputes required only factual determinations.

¶10 Royalty Owners appealed to the court of appeals, which reversed the district court, holding that COGCC reasonably concluded that it lacked jurisdiction under section 34-60-118.5(5). *Antero Res. Corp. v. Airport Land Partners, Ltd.*, No. 19CA1799, ¶ 25 (June 3, 2021). In reaching this conclusion, the division disagreed with the district court's finding that the leases at issue did not require legal interpretation. *Id.* at ¶ 24. Instead, the division concluded, relevant terms in each of the leases were subject to legal debate. *Id.* at ¶¶ 23–24. The division explained that because the parties disagreed over the extent of Royalty Owners' legal entitlement to further payments under the leases, COGCC reasonably concluded that bona fide disputes of contract interpretation divested it of jurisdiction over the claims. *Id.* at ¶ 25.

¶11 Antero petitioned this court for certiorari review, which we granted. We now affirm the court of appeals' decision.

7

## II. Analysis

¶12    The Oil and Gas Conservation Act (the "Act") grants COGCC jurisdiction over certain issues in payment-of-proceeds disputes. Disputes that COGCC may hear, however, do not include those involving bona fide disputes over the interpretation of a contract for payment. After explaining the standard of review applicable in this case, we examine section 34-60-118.5's framework and conclude that a bona fide dispute of contract interpretation exists where parties in good faith dispute the meaning or application of a relevant contractual term. We then look at the leases at issue and conclude that they are subject to bona fide disputes over their proper interpretation and that these interpretive disputes are appropriately resolved by courts and not COGCC.

### A. Standard of Review

¶13    We review issues of statutory interpretation de novo. *UMB Bank, N.A. v. Landmark Towers Ass'n*, 2017 CO 107, ¶ 22, 408 P.3d 836, 840. In so doing, we read the statutory scheme as a whole and give consistent, harmonious, and sensible effect to all its parts. *Id.* When interpreting a statute "our primary aim is to effectuate the legislature's intent." *Nieto v. Clark's Mkt., Inc.*, 2021 CO 48, ¶ 12, 488 P.3d 1140, 1143. We give words and phrases their plain and ordinary meanings and when statutory language is clear, we apply it as written without resort to other rules of statutory construction. *UMB Bank*, ¶ 22, 408 P.3d at 840. When statutory

8

language is ambiguous—that is, reasonably susceptible of multiple interpretations—we may look to legislative intent and history as well as the possible consequences of different interpretations. *Colo. Oil & Gas Conservation Comm'n v. Martinez*, 2019 CO 3, ¶ 19, 433 P.3d 22, 28.

## B. The Oil and Gas Conservation Act

¶14 The legislative declaration of the Act directs COGCC to, among other things, "[s]afeguard, protect, and enforce the coequal and correlative rights of owners and producers in a common source or pool of oil and gas to the end that each such owner and producer . . . may obtain a just and equitable share of production therefrom." § 34-60-102(1)(a)(III), C.R.S. (2022).

¶15 A "pool," as used in this provision, means "an underground reservoir containing a common accumulation of oil or gas, or both." § 34-60-103(9), C.R.S. (2022). Pooling is the consolidation of various mineral interests into one "drilling and spacing unit" so that a single well can efficiently drain a large area of oil and gas with each interest holder in the pool bearing costs and receiving proceeds according to their interest type. *Frequently Asked Questions Related to Statutory Pooling in Colorado*, COGCC, https://cogcc.state.co.us/documents/about/Help/Pooling%20Pamphlet.pdf (last visited Mar. 21, 2023) [https://perma.cc/J8GB-CUC5]; *see also* § 34-60-116(2), C.R.S. (2022). In the absence of voluntary pooling through private contract, COGCC administers a statutory pooling process. *See*

9

§ 34-60-116(2). Statutory pooling consolidates both leased and unleased mineral interests, and unleased mineral owners in a pool can either opt to participate or be deemed "nonconsenting." *Frequently Asked Questions Related to Statutory Pooling in Colorado*, *supra*. Neither unleased participating mineral owners or nonconsenting mineral owners are parties to lease agreements; their payment amounts are determined by statute. *Id.* Other mineral owners are parties to lease contracts and their legal rights are defined by some combination of their private agreements and the statutory requirements. *Id.*

¶16 To facilitate COGCC's responsibility to protect the rights of both owners and producers, section 34-60-118.5 of the Act ("section 118.5") — enacted in 1989 — gives COGCC the authority to address issues of untimely payment of proceeds by payers to payees by:[2]

- setting default deadlines by which payments must be made,
  § 34-60-118.5(2)(a);

- requiring payers to disclose certain information to payees on payment,
  § 34-60-118.5(2.3);

---

[2] A "payee" is "any person or persons legally entitled to payment from proceeds derived from the sale of oil, gas, or associated products from a well in Colorado," and "payer," in relevant part, is an operator that "has entered into an agreement under which the operator of a well has accepted responsibility for making payments to payees." § 34-60-118.5(1)(a)–(b).

- providing a mechanism by which payees can request information from payers on adjustments or deductions to payments, § 34-60-118.5(2.5);

- providing penalties for payers who fail to provide the required information, § 34-60-118.5(2.7);

- setting out reasons that justify delayed payment, § 34-60-118.5(3); and

- requiring payment of interest where a delay in payment is unjustified, § 34-60-118.5(4).

¶17    After setting out these obligations, section 118.5 defines COGCC's jurisdiction, explaining that the Commission "shall have jurisdiction to determine" the payment due date under subsection (2), whether any circumstances exist that would justify a delay in payment under subsection (3), and the amount due, including interest, if any. § 34-60-118.5(5). However, that jurisdiction exists only in the absence of "a bona fide dispute over the interpretation of a contract for payment." *Id.*

¶18    The next subsection reiterates the jurisdictional limitation created by the existence of a "bona fide dispute over the interpretation of a contact for payment," directing:

Before hearing the merits of any proceeding regarding the payment of proceeds pursuant to this section, the oil and gas conservation commission shall determine whether a bona fide dispute exists regarding the interpretation of a contract defining the rights and obligations of the payer and payee. If the commission finds that such a dispute exists, the commission shall decline jurisdiction over the dispute and the parties may seek resolution of the matter in district court.

11

§ 34-60-118.5(5.5).

¶19    Finally, section 118.5 closes by emphasizing that "[n]othing in this section shall be construed to . . . impose upon [COGCC] any duty to interpret a contract from which the obligation to pay proceeds arises." § 34-60-118.5(8)(a).

¶20    Our duty to read the statutory scheme as a whole requires us to consider how the three distinct references to contract interpretation in section 118.5 should be read together. The strong directive in subsection (8)(a) that section 118.5 shall not be construed "to impose upon [COGCC] *any* duty to interpret a contract," (emphasis added), must inform the meaning of a "bona fide dispute over the interpretation of a contract" in subsection (5). The most sensible reading of these provisions together is that once parties whose mineral interests are the subject of a lease agreement have raised a nonfrivolous, genuine dispute about a contract term, jurisdiction to interpret that contract lies with the courts, and not with COGCC.

¶21    Subsection (5.5) does not alter this conclusion. The provision requiring the Commission to determine whether a bona fide dispute over contract interpretation exists, and to decline jurisdiction if it does, cannot be read to require COGCC to first engage in contract interpretation to assess the bona fides of the dispute and then to decline jurisdiction. That approach would run afoul of subsection (8)(a)'s

command that "[n]othing in this section shall be construed" to require COGCC to interpret contracts.

¶22    The only way to read the three references to bona fide contract disputes in section 118.5 harmoniously is to conclude that when the parties in good faith disagree about the meaning or application of a relevant term in a lease agreement or contract, there is a "bona fide dispute over the interpretation of a contract" that divests COGCC of jurisdiction.[3]

---

[3] This clear legislative intent to keep contract interpretation with courts, however, does not mean that COGCC lacks jurisdiction in all payment-of-proceeds disputes involving parties to a contract. For example, one can imagine a dispute over the timeliness of royalty payments where the parties agree that the applicable lease does not provide for payment deadlines—and thus the default deadlines of section 118.5(2)(a) govern—and on the royalty amount due pursuant to the lease but disagree about whether or to what extent a particular royalty payment was untimely and whether the payer owes any interest on that payment. In that case, COGCC would have jurisdiction to determine whether the deadline for payment under section 118.5(2)(a) had passed, whether and to what extent the payer's duty to comply with those deadlines was suspended under section 118.5(3), and the amount plus interest, if any, still due the payee. Those determinations would not require interpretation of the contract, and thus would be within the jurisdiction of COGCC. But the plain language of the statute makes clear that when the resolution of the narrow issues over which COGCC normally has jurisdiction involves any amount of contractual interpretation, the issues belong with district courts.

## C. The Act Does Not Permit COGCC to Interpret Disputed Contractual Terms

¶23    While the Act has been amended in the years since the court of appeals decided *Grynberg*, its relevant provisions are unchanged, and the court in that case recognized what we do today—that any good faith contract dispute deprives COGCC of jurisdiction by the terms of the statute.

¶24    As the division in this dispute recognized, the facts of *Grynberg* are "strikingly similar" to those we confront here. *Antero*, ¶ 17. *Grynberg* involved a disagreement between oil and gas operators and royalty owners over whether the operators could, consistent with the parties' lease, deduct certain post-production costs in calculating the royalties due to the royalty owners. 7 P.3d at 1062. The royalty owners initially filed their claims before a district court but then filed an application before COGCC, prompting the district court to stay its proceedings pending COGCC's resolution. *Id.* As here, COGCC dismissed the application, concluding that it lacked jurisdiction over the dispute because it "related to the legality of specific deductions," which would require it to interpret the contract creating the royalty interests. *Id.* The operators sought judicial review of COGCC's determination in district court, and the district court affirmed. *Id.*

¶25    The court of appeals also affirmed, holding that COGCC "does not have jurisdiction to interpret any royalty agreement to determine the propriety of disputed post-production deductions." *Id.* at 1063. The court of appeals observed

14

that the Act required payers to make timely payments of proceeds to "payees" and gave COGCC jurisdiction to enforce compliance, but that the definition of "payees" was "any person or persons *legally entitled* to payment from proceeds." *Id.* (quoting § 34-60-118.5(1)(a)). Section 118.5, the court held, "does not create an entitlement to proceeds; it presumes the existence of such an entitlement and imposes deadlines for the payment to those legally entitled to receive payment." *Id.* Further, the court concluded, the General Assembly intended only to grant COGCC jurisdiction over "actions for the timely payment of proceeds," not over "the legal entitlement to proceeds under the terms of a specific royalty agreement." *Id.* Because it was "the extent of [the royalty owners'] legal entitlement to further payments under the royalty agreement" that was truly at issue, the court held that the question belonged in the court and not with COGCC. *Id.*

¶26 This understanding of section 118.5 and its allocation of jurisdiction prevailed in our state for more than fifteen years. In this dispute, however, the district court took a novel view, concluding that the lease terms were unambiguous or the subject of a factual, rather than legal, dispute such that no interpretation would be necessary for COGCC to resolve the parties' disputed claims about their meaning. This reasoning rests on a much too narrow conception of contract interpretation.

¶27 First, the determination that contract language is unambiguous is itself contract interpretation. Where parties proffer divergent interpretations of contractual language, the fact that the dispute ends in a determination that the language *unambiguously* favors one party's position does not mean that the adjudicating entity did not need to interpret the contract to arrive at that conclusion. *See Lake Durango Water Co. v. Pub. Utils. Comm'n*, 67 P.3d 12, 20 (Colo. 2003) ("Whether a written contract is ambiguous and, if not deemed ambiguous, how the unambiguous contractual language should be construed, are questions of law that we review de novo."). To the contrary, interpreting a contract as unambiguous is just that—interpreting a contract.

¶28 Second, the line between factual findings and contract interpretation is not so clean as the district court asserted. Instead, questions of fact are often deeply intertwined with contract interpretation such that the two may be inseparable. Illustrating this point is the definition of "interpretation" in Black's Law Dictionary: "The ascertainment of a text's meaning; *specif., the determination of how a text most fittingly applies to particular facts*." *Interpretation*, Black's Law Dictionary (11th ed. 2019) (emphasis added).

¶29 Moreover, the district court's narrow view of what constitutes "interpretation" and its resulting expansive view of COGCC's jurisdiction is fundamentally at odds with the statutory scheme detailed above. The statute does

not confer on COGCC the authority to interpret any disputed contract terms—even if those terms seem unambiguous or depend on factual determinations. Rather, the statute clearly removes from COGCC's jurisdiction any bona fide—that is, "[m]ade in good faith; without fraud or deceit" or "[s]incere; genuine,"[4]—disagreement that requires any degree of contract interpretation to resolve.

## III. Application

¶30   We now turn to the disputes regarding the leases at issue here and conclude that each presents a bona fide dispute of contract interpretation because the parties have a good faith disagreement over the meaning of relevant contract terms.

## A. The Airport Land Lease

¶31   Airport Land and Antero agree that the Airport Land Lease does not address the deduction of post-production costs and therefore the implied covenant to market applies. We have explained that where a lease is silent with respect to the allocation of production costs, "the implied covenant to market requires that the lessee produce gas and incur those expenses necessary to place gas in a condition acceptable for market." *Rogers v. Westerman Farm Co.*, 29 P.3d 887, 903 (Colo. 2001); *see also Garman v. Conoco, Inc.*, 886 P.2d 652, 659 (Colo. 1994). "Gas is

---

[4] *Bona fide*, Black's Law Dictionary (11th ed. 2019).

17

marketable when it is in the physical condition such that it is acceptable to be bought and sold in a commercial marketplace, and in the location of a commercial marketplace, such that it is commercially saleable in the oil and gas marketplace." *Rogers*, 29 P.3d at 906. Whether gas is marketable is a question of fact. *Id.* at 905.

¶32 The parties take different positions on where the first point of marketability was, with Airport Land asserting it was where the natural gas liquids were fractionated and sold to third-party purchasers based on market index prices and Antero asserting it was at the wellhead or the inlet of the first processing facility. The parties also dispute whether Antero can deduct reservation fees from the royalties consistent with the implied covenant.

¶33 COGCC lacks jurisdiction to resolve this dispute because it involves a good faith dispute over how to interpret relevant contract terms — specifically the parties contest the meaning of the contract term "marketability" and whether reservation fees are among "those expenses necessary to place gas in a condition acceptable for market" that Antero must bear under the implied covenant. *See Rogers*, 29 P.3d at 903. The district court concluded that COGCC had jurisdiction here because (1) under *Rogers* the marketability of gas is a factual question and (2) the resolution of factual issues is not contract interpretation. We disagree. As discussed above, that an issue presents a question of fact does not necessarily separate it from the realm of contract interpretation.

18

¶34     Moreover, although this court has provided substantial guidance on how to interpret the implied covenant to market, it nevertheless has left open many issues of interpretation.  For example, *Rogers* left undefined terms such as "commercial marketplace" and "commercially saleable," — components of the term "marketability" — that require interpretation in this dispute.  *See id.* at 906.  And *Rogers* also recognized the fluidity of interpreting the covenant, making clear that interpretive questions remain.  *Id.* at 905 n.21 ("We disagree that certain costs are deductible in calculating royalties as a matter of law because this view fails to recognize that similar types of costs may be deductible under some circumstances and not deductible under other circumstances.").  This type of determination, and what it means for the interpretation of contract terms, is not within COGCC's jurisdiction.[5]

---

[5] That the implied covenant to market is, as its name suggests, *implied* rather than an express term of the governing contract, is of no moment to COGCC's jurisdiction.  "Under Colorado law, the duty to market is a covenant *contained in every oil and gas lease*."  *Rogers*, 29 P.3d at 902 (emphasis added).  Moreover, section 118.5 does not remove from COGCC's jurisdiction only those interpretive disputes over the express terms of a contract for payment.  *UMB Bank*, ¶ 22, 408 P.3d at 840 ("[W]e do not add words to the statute or subtract words from it." (citation omitted)).

## B. The Casey Lease

¶35 Paragraph 3 of the Casey Lease provides for payment of royalties on the "market price" of the gas products sold, "free of production costs, gathering costs, dehydration costs, compression costs, manufacturing costs, processing and treating costs, marketing costs, transportation costs and free of any and all other costs, except taxes and conservation charges" assessable to Antero. The same provision defines "market price" as "either the fair and reasonable value thereof at the place where sold or used or the selling price if sold under bona fide contracts of sale with third persons."

¶36 Casey argues that Antero's use of gas as in-kind payment without paying royalties violates the lease because the transfer without payment was an unpermitted cost deduction. Casey also argues that the no-cost provision of the lease controls over the "fair and reasonable" language in the market price definition and that no costs can be deducted no matter which market price definition applies. In contrast, Antero argues that it paid royalties on the fair and reasonable value of the gas and that the lease allows for processing and transportation deductions after the gas is marketable.

¶37 COGCC lacks jurisdiction to resolve this dispute because it involves a bona fide dispute over the meaning and application of terms in the lease contract—specifically which contractual definition of "market price" prevails and whether

the in-kind payments and other deductions are consistent with the no-cost provision. While the district court's conclusion that the lease unambiguously prohibits the costs and requires Antero to use the actual sale price in calculating the royalties may be correct, the court had to interpret the lease to reach this conclusion. Indeed, the court spent several pages of its opinion interpreting the lease and, in essence, rejecting Antero's competing interpretation. COGCC is not statutorily authorized to engage in this type of analysis.

## C. The Limbach-Shuster Leases

¶38 The Limbach-Shuster Leases provide for royalties to be paid on the "value" of certain gas products. Paragraph 4.2.1 of each lease goes on to define the "value" of the products as "[t]heir selling price, if sold under bona fide contracts of sale with Third Persons," or, "[i]f they are not so sold to Third Persons, the fair and reasonable value thereof at the place where sold or used." Paragraph 4.5 of the leases further provides that the royalties shall be paid "free of all costs of any kind, including, but not limited to, costs of gathering, production, transportation, treating, compression, dehydration, processing, marketing, truck or other expense, directly incurred by Lessee, whether as direct charge or a reduced price or otherwise." Under these paragraphs, Antero agreed to "bear one hundred percent (100%) of all costs and expenses incurred in rendering hydrocarbons

21

produced on or from the Leased premises marketable and delivering the same into the first interstate pipeline."

¶39 The Limbach-Shusters argue that Antero failed to pay royalties based on sale prices to third persons by deducting transportation, processing, and treating costs from the selling price. They also argue that Antero first did not pay any royalties on gas used as in-kind payments and later paid royalties on such gas with transportation and other costs deducted. Antero responds that it paid royalties on the fair and reasonable value of the gas at the places where sold or used and that it was entitled to charge reservation and other fees against the royalties.

¶40 COGCC lacks jurisdiction to resolve this dispute because, like the others at issue, it involves genuine disputes over how best to interpret the terms of the parties' agreements—specifically which of two definitions of "value" included in the agreements prevails and whether the fees deducted constitute "costs" that cannot be deducted under the leases. As with the Casey Lease, the district court's conclusion that the leases unambiguously prohibit the costs and require royalties to be calculated on the sale price may indeed be the proper interpretation of the Limbach-Shuster Leases. But the district court engaged in contract interpretation to reach that conclusion and, as the court of appeals recognized, its reading of the lease language is but "one possible reading."

22

¶41 For each of the lease agreements at issue, the parties sincerely disagree about the meaning and appropriate application of contract terms. This is precisely the type of dispute that the Act carves out of COGCC's jurisdiction. When parties, like those here, disagree about the meaning of agreements they have entered, the courts are the appropriate forum for resolution of these contract disputes. The Act very explicitly imposes on COGCC no "duty to interpret a contract from which the obligation to pay proceeds arises." § 34-60-118.5(8)(a).

## IV. Conclusion

¶42 Section 118.5 grants COGCC jurisdiction to resolve certain issues in payment-of-proceeds disputes. But where parties to a payment-of-proceeds dispute bring a bona fide dispute of contract interpretation, COGCC lacks jurisdiction to resolve the dispute under section 118.5(5). Where, as here, parties have a good faith dispute about the meaning or application of relevant contractual terms, they bring bona fide disputes of contract interpretation that COGCC is prohibited from resolving and that instead belong in district court.

**JUSTICE SAMOUR**, joined by **JUSTICE HOOD** and **JUSTICE BERKENKOTTER**, dissented.

JUSTICE SAMOUR, joined by JUSTICE HOOD and JUSTICE BERKENKOTTER, dissenting.

¶43 Two district court judges, the Honorable Denise K. Lynch and the Honorable Morris B. Hoffman (retired), separately concluded that the Colorado Oil and Gas Conservation Commission ("Commission" or "COGCC") had jurisdiction over these disputes.[1] After Judge Lynch's thoughtful orders rejected the royalty owners' claims that the Commission lacked jurisdiction, the royalty owners advanced the exact same claims in front of the Commission. The Commission disagreed with Judge Lynch, observing in part that it had neither the time nor the resources to deal with these disputes. It thus gave the royalty owners clearance to return to the district court, this time in front of Judge Hoffman.

¶44 In a sensible, well-reasoned, and thorough twenty-one-page order, Judge Hoffman concluded that the Commission's determinations that it lacked jurisdiction in these cases were erroneous as a matter of law. He therefore remanded the cases back to the Commission for further proceedings. The royalty owners and the Commission appealed to the court of appeals, and a division of that court sided with them.

---

[1] Judge Lynch relied in part on an earlier order issued in an unrelated matter by a third district court judge, the Honorable John F. Neiley.

¶45 Today, so does a majority of this court. Like the division, the majority unnecessarily second-guesses the district court judges. In the process, it reaches an incorrect conclusion that will have unintended consequences for our district courts. Rather than put its proverbial foot down to prevent the Commission from wrongly passing the buck to our overburdened and overworked district courts, the majority empowers the Commission to evade responsibility specifically delegated to it by the legislature. And, concerningly, it does so by (1) blurring the line between *interpreting* an ambiguous contract and *applying or enforcing* an unambiguous contract, and (2) equating *reading* a contract to determine whether it's ambiguous with *interpreting* an ambiguous contract. These missteps lead the majority to ultimately hold that whenever parties have a bona fide dispute over either the meaning *or the application—or presumably the enforcement—*of a relevant contractual term (whether ambiguous or not), "they bring bona fide disputes of contract *interpretation* that COGCC is prohibited from resolving and that instead belong in district court." Maj. op. ¶ 42 (emphasis added); *see also id.* at ¶¶ 22, 30 (same).

¶46 Because today's decision misconstrues our statutory law and will have unwitting consequences for our district courts, I must respectfully dissent.

# I. Introduction

¶47 I skip over the relevant facts and procedural history because the majority has covered them already. Instead, I start by framing the issue before us. I then analyze why the majority's decision is mistaken. I wholeheartedly agree with the orders issued by the district court judges. In my view, those orders were spot-on and shouldn't have been second-guessed, much less by two different appellate courts.

# II. What's the Issue?

¶48 The disputes between the parties in these three consolidated cases arose from contracts for royalty payments allegedly owed on gas wells in Garfield County. The owners of the gas wells allege that their operators improperly deducted certain costs and thus underpaid some of the royalties or proceeds due. The issue is whether the Commission has jurisdiction over the disputes.

¶49 Section 34-60-118.5, C.R.S. (2022), which is specifically titled "Payment of proceeds—definitions," addresses the Commission's jurisdiction:

> (5) Absent a bona fide dispute over the interpretation of a contract for payment, the oil and gas conservation commission shall have jurisdiction to determine the following:
>
> (a) The date on which payment of proceeds is due a payee under subsection (2) of this section;
>
> (b) The existence or nonexistence of an occurrence pursuant to subsection (3) of this section which would justifiably cause a delay in payment; and

3

(c) The amount of the proceeds plus interest, if any, due a payee by a payer.

(5.5) Before hearing the merits of any proceeding regarding payment of proceeds pursuant to this section, the oil and gas conservation commission shall determine whether a bona fide dispute exists regarding the interpretation of a contract defining the rights and obligations of the payer and payee. If the commission finds that such a dispute exists, the commission shall decline jurisdiction over the dispute and the parties may seek resolution of the matter in district court.

§ 34-60-118.5(5)–(5.5).

¶50 Subsections (5) and (5.5) require a two-tier analysis. The first question is: Does the dispute fall within one of the three specific grants of jurisdiction to the Commission set forth in subsections (5)(a)–(c)? If the answer is no, the analysis ends because the Commission lacks jurisdiction over the dispute. But if the answer is yes, then a second question must be asked: Does the Commission nevertheless lack jurisdiction because the dispute constitutes a "bona fide dispute over the interpretation of a contract for payment"? Not surprisingly, the legislature wanted district courts, not the Commission, to resolve bona fide disputes over the interpretation of a contract for payment.

### III. The Correct Analysis

¶51 The majority skips over the first question, presumably because it recognizes that the disputes in question are over the "amount . . . due" and therefore come within the ambit of subsection (5)(c) ("The amount of the proceeds plus interest, if

4

any, due a payee by a payer."). Because I see it the same way, I perceive no need to belabor the point.

¶52 Where the rubber meets the road is in the second question. This case comes down to whether the parties' disputes over the royalty proceeds are bona fide disputes regarding the interpretation of a contract for payment. If they are, the Commission has no jurisdiction over them, and the disputes must be resolved by the district court. If they aren't, the Commission has jurisdiction over them and may resolve them.

## A. Interpretation Isn't the Same as Application or Enforcement, and Reading Doesn't Constitute Interpretation

¶53 The majority sees no daylight between interpreting an ambiguous contract and applying or enforcing an unambiguous contract. This is error. And, relatedly, it is error for the majority to equate reading a contract to determine whether it is ambiguous with interpreting an ambiguous contract. The result is that the majority shrinks the jurisdiction of the Commission and, correspondingly, supersizes the jurisdiction of the district court.[2]

_____

[2] As an aside, I note that the majority's discussion of subsection (8)(a) of the statute, Maj. op. ¶¶ 19–22, seems superfluous. *See* § 34-60-118.5(8)(a) (emphasizing that "[n]othing in this section shall be construed to . . . impose upon [COGCC] any duty to interpret a contract from which the obligation to pay proceeds arises"). I'm not

¶54 The district court judges both understandably read each agreement to discern whether there was a bona fide dispute over contract interpretation. Each judge wisely determined that the relevant language in the agreements was clear and unambiguous, and that, therefore, there were no terms requiring interpretation. Rather than find bona fide disagreements over contract interpretation, they found disagreements implicating questions of fact as to whether the royalties were properly calculated. And, they concluded, the Commission was equipped, if not uniquely so, to address those factual questions.[3]

---

sure what subsection (8)(a) adds to the analysis. The majority tells us that subsection (8)(a) informs the meaning of a "bona fide dispute over the interpretation of a contract" in subsections (5) and (5.5). Maj. op. ¶¶ 20–21. But the majority leaves us hanging and never explains *how* subsection (8)(a) does so. *Id.* Subsections (5) and (5.5) speak for themselves and need no assistance from subsection (8)(a).

[3] The Commission's complaint that it has neither the time nor the resources to deal with the types of disputes in question rings hollow to me. In 2019, the General Assembly expanded the Commission's resources for contested hearings by enacting Senate Bill 19-181, which included amendments to various sections of the Oil and Gas Conservation Act. Ch. 120, sec. 1–20, 2019 Colo. Sess. Laws 502–21. For instance, an administrative law judge or hearing officer is assigned as a matter of course to every contested case. Dep't of Nat. Res., 2 Colo. Code Regs. 404-1:507 (2022) (amended pursuant to the legislative mandate in sections 34-60-106(6) and 34-60-108(9)). Even assuming the Commission's grievances have merit, the place to air them is across the street—at the legislature.

## B. Application

¶55    I examine each case in turn, largely tracking the district court's last order.[4] I then hone in on the majority's misconception of subsections (5) and (5.5).

### 1. The Casey Case

¶56    In the Casey case, the terms of the agreement were as clear and unambiguous as words could be in prohibiting from the calculation of royalties the deduction of all costs except taxes and conservation charges.  As such, costs related to in-kind transfers of gas for services could not be deducted; the costs of those services themselves would have been nondeductible if they had been paid in cash.  Alternatively, because the operators used gas to pay for services during in-kind transfers, each such transfer constituted a *sale* of gas just as if gas had been sold for cash and the cash had then been used to pay for those services.  Under either view, royalties were clearly and unambiguously owed on the gas transferred during in-kind transactions.  Finally, the term "prevailing market price" in the agreement did not create an ambiguity requiring contract interpretation.  The agreement was clear and unambiguous: If gas was actually sold, and if the sale was at arm's length to a "third person" (as that term was

---

[4] I focus on the district court's last order (Judge Hoffman's order) because it's the one that was reversed by the division.

defined in the agreement), then the royalty had to be based on the sales price; and, in the absence of an arm's-length sale to a third person, the "fair and reasonable value" of the gas applied. Thus, any pertinent determinations were factual and didn't require contract interpretation.

## 2. The Limbach-Shuster Case

¶57 Similar to the agreement in the Casey case, the agreements in the Limbach-Shuster case clearly and unambiguously prohibited the operators from deducting "all costs of any kind," though this prohibition was even more categorical because it wasn't accompanied by an exception for taxes and conservation charges. That the agreements contained a provision regarding examples of costs that could not be deducted ("free of all costs of any kind, including, but not limited to"), and that "reservation fees" were absent from that illustrative list, didn't render the "all costs of any kind" language unclear or ambiguous. The Limbach-Shuster agreements were also not at all unclear or ambiguous as to whether the in-kind transfer of gas for services constituted a *sale* for purposes of triggering a royalty obligation. As explained in relation to the Casey case, the gas exchanged in any such transfer was sold just as much as if the operators had sold it for cash and then used that cash to pay for the services. Finally, as with the agreement in the Casey case, the Limbach-Shuster agreements provided two alternate measures of market price, but the agreements clearly and unambiguously stated that one measure was

8

to be used if the gas was sold at arm's length to a third person (the sales price) and a different measure was to be used if the gas was not transferred as part of an arm's-length sale to a third person (the fair and reasonable value). Whether these transactions were to a "third person," as that term was defined in the agreements, was a question of fact, as was the determination of the sales price and, if applicable, the ascertainment of the fair and reasonable value of the transferred gas.

### 3. The Airport Land Case

¶58 It is true that in the Airport Land case, the two agreements were silent on the deduction of costs from the calculation of royalties. But this silence did not create ambiguity. As the parties stipulate, well-settled Colorado law implies a covenant of marketability in that situation, and that covenant obligated the operators to produce the gas in a marketable state and, accordingly, imposed on them the burden of bearing all post-production costs necessary to make the gas marketable. *See Rogers v. Westerman Farm Co.*, 29 P.3d 887, 905–06 (Colo. 2001). It follows that those costs could not be deducted in calculating the royalties due. *See Garman v. Conoco, Inc.*, 886 P.2d 652, 659 (Colo. 1994). Importantly, in *Rogers*, we defined for the first time the covenant of marketability and made clear that questions of whether and when a particular product in a case has been rendered "marketable" and, thus, questions of whether and which costs incurred in bringing that product to a given state of marketability may be deducted from

9

royalties due, are all questions of fact, not of law. 29 P.3d at 905–06. Given its administrative discretion and expertise, the Commission was particularly well suited to resolve these types of factual questions in order to determine the benchmark of marketability. Such questions were certainly not questions requiring the interpretation of a contract. In fact, the royalty owners did not cite a single ambiguous provision in the agreements. The fact that "marketability" was not referenced or defined in the agreements was of no moment because that term was implied and defined by our jurisprudence.[5]

### 4. Where the Majority Goes Astray

¶59 The majority second-guesses the district court for engaging in the straightforward and statute-honoring analysis I've summarized. According to the majority, the district court erred in distinguishing between interpreting an ambiguous contract and applying or enforcing an unambiguous contract. And, adds the majority, the district court interpreted the contracts by merely reading them and determining that they contained no ambiguity.

---

[5] The general rule is that silence in an agreement as to a particular matter doesn't create an ambiguity. *See Cheyenne Mountain Sch. Dist. No. 12 v. Thompson*, 861 P.2d 711, 715 (Colo. 1993). The one exception is if the matter naturally falls within the scope of the agreement. *Id.* The deduction of costs arguably fell within the scope of the agreements in the Airport Land case. But our case law bridged any gap in those agreements, directly undercutting the contention by the royalty owners and the Commission that an ambiguity requiring interpretation existed.

¶60    Notably, as it relates to the Casey case, the majority actually acknowledges that the district court's conclusion that the agreement "unambiguously prohibit[ed] the costs . . . *may be correct*." Maj. op. ¶ 37 (emphasis added). And the majority reaches a similar determination with respect to the agreements in the Limbach-Shuster case. *Id.* at ¶ 40. But, says the majority, the Commission nevertheless lacked jurisdiction over these cases because the district court necessarily engaged in the *interpretation* of the contracts in question in two independent ways: (1) by *reading* them and detecting no ambiguity in them, and (2) by attempting to apply or enforce them. *Id.* at ¶¶ 37, 40. Stated differently, under the majority's approach, even when a contract plainly, clearly, and unambiguously prohibits the deduction of all relevant costs from the calculation of royalties, the district court engages in the interpretation of a contract by either acknowledging that the contract contains no ambiguity or approving the application or enforcement of the contract. For multiple reasons, I respectfully disagree.

¶61    First, although the majority notes that the parties "proffer[ed] divergent *interpretations* of contractual language," *id.* at ¶ 27 (emphasis added), the record reflects otherwise. As a matter of fact, the district court repeatedly made clear throughout its last order that the parties had not proffered different interpretations of any language in the agreements. Tellingly, the majority never identifies the

11

"relevant contract terms" whose "meaning" the parties supposedly disputed. *Id.* at ¶ 30 (noting vaguely that "the parties have a good faith disagreement over the meaning of relevant contract terms"); *see also id.* at ¶¶ 4, 41 (making a similar general statement). There are none.

¶62 Despite undoubtedly scouring the record, the best the majority can do is extract *factual* disputes. *Id.* at ¶¶ 6, 33–34, 37, 40. Apparently recognizing as much, the majority dresses some of these factual disputes as legal questions requiring the interpretation of contractual terms.

¶63 For example: in the Casey case, the majority points to quarrels about which definition of "market price" prevailed "and whether the in-kind payments and other deductions" were governed by the no-cost provision of the agreement, *id.* at ¶ 37; in the Limbach-Shuster case, the majority cites disagreements as to "which of two definitions of 'value'" controlled and whether "the fees deducted" constituted nondeductible costs, *id.* at ¶ 40; and in the Airport Land case, the majority discusses the contentions regarding what "marketability" meant and whether "reservation fees" could be deducted, *id.* at ¶ 33. But not a single one of these disputes required the interpretation of a contract. With one exception, all of these issues were addressed in plain, clear, and unambiguous terms in the agreements; all anyone had to do to resolve them was read the agreements, which is precisely what the district court did. The one exception was the dispute over

12

"marketability" in the Airport Land case, since that term was not referenced or defined in the relevant agreements. As mentioned, however, the parties stipulated that our case law implied and defined "marketability." And though the majority leans on the dispute surrounding "marketability" to identify an ambiguity requiring contract interpretation, it recognizes that we, ourselves, have defined that term and have made clear that it is implied in a situation like that involved in the Airport Land case. *Id.* at ¶¶ 6, 31–32.

¶64 Thus, any disputes in the three cases were factual ones that shouldn't have been used by the Commission as an excuse to get out of doing work specifically assigned to it by the legislature. While the disputes highlighted by the majority might masquerade as legal ones, they are clearly factual ones. Much like I do, the district court saw through the royalty owners' attempt to manufacture legal questions related to the interpretation of contractual terms.

¶65 Second, even if the parties had proffered divergent interpretations of contractual language, our case law is clear that such interpretations wouldn't have rendered the language ambiguous. *See Fibreglas Fabricators, Inc. v. Kylberg*, 799 P.2d 371, 374 (Colo. 1990) (recognizing that contractual language isn't ambiguous simply because the parties claim it means different things). Contractual disputes occur with some frequency; the fact that there is a disagreement over contractual language doesn't make that language ambiguous. *Id.*

¶66 Third, as the district court aptly reasoned, the language in subsections (5) and (5.5) does not prevent the Commission from deciding any bona fide dispute *involving* a contract or any bona fide dispute that is *contractual in nature*. Rather, those subsections divest the Commission of jurisdiction when there is a bona fide dispute over the *interpretation* of a contract. The fact that the operators and royalty owners have written contracts governing the royalties that are the subject of their disputes doesn't mean that any reading of those contracts to discern whether they contain ambiguous terms constitutes "interpretation" of the contracts. Nor can we disregard the difference between *interpreting* a contract and *applying* or *enforcing* a contract. When, as here, the plain language of a contract is clear and unambiguous, the situation calls for application or enforcement, not interpretation, of the contract. *See Allen v. Pacheco*, 71 P.3d 375, 378 (Colo. 2003) (explaining that "[w]e will enforce" an unambiguous agreement "as written" and that an agreement "must be given effect according to the plain and ordinary meaning of its terms"). In that scenario, there's nothing to interpret.

¶67 The majority gives the Commission license to sidestep its statutory responsibilities whenever there is a bona fide dispute that in any way involves a contract or is contractual in nature. In so doing, the majority fails to hew to the plain language of subsections (5) and (5.5).

14

¶68    Black's Law Dictionary defines "interpretation" as "[t]he ascertainment of a text's meaning; specif., the determination of how a text most fittingly applies to particular facts." *Interpretation*, Black's Law Dictionary (11th ed. 2019). The majority relies on this definition too. Maj. op. ¶ 28. But it completely ignores the first part and focuses exclusively on the part that follows the semicolon—"the determination of how a text most fittingly applies to particular facts." *Id.* Consequently, the majority equates "interpretation" or "meaning" with "application" (and presumably enforcement). *Id.* at ¶ 12 (referring to the parties' disagreement over "the meaning or application" of a relevant contractual term); *see also id.* at ¶¶ 4, 42 (same). Of course, these are by no means synonymous terms. And Black's Law Dictionary doesn't support the majority's treatment of them as such. Under the dictionary's definition, to interpret a contract is to *ascertain the meaning of the text*, specifically when *that* is done in applying the text to particular facts. It's one definition, not two alternative definitions, as the majority seems to think.

¶69    In these cases, no *ascertainment of the meaning of the text* was required, and none occurred—whether in the specific context of applying the text to particular facts or in any other context. That's because the contracts were clear and unambiguous. All that was necessary was to read them and then apply them or enforce them as written. Inasmuch as there was no ambiguity, confusion, or lack

15

of clarity, there was no need to *ascertain the meaning* of any term; anyone able to read English could have understood what the contracts provided.

¶70 Today's decision would come out differently if the majority both gave effect to the plain and ordinary meaning of the "interpretation of a contract" phrase in subsections (5) and (5.5) and refrained from adding the application—and presumably the enforcement—of an unambiguous contract as interchangeable with the interpretation of an ambiguous contract. Our cases teach that the majority should have heeded the twin pillars of statutory construction undergirding this observation. *See Nieto v. Clark's Mkt., Inc.*, 2021 CO 48, ¶ 12, 488 P.3d 1140, 1143 (admonishing courts both to accord words and phrases in a statute their plain and ordinary meaning and to refrain from adding words to a statute).

¶71 Lastly, if judges and Commission members are not allowed to do what the district court did in its last order, how are they supposed to determine, pursuant to subsections (5) and (5.5), whether there is a good faith dispute over the interpretation of a contract? How can one determine if there is a genuine, sincere, or good faith dispute over the interpretation of a contract without reading the contract to discern whether it is clear and unambiguous?

¶72 Under today's holding, it doesn't matter whether every single term in a contract for royalty proceeds is completely clear and unambiguous. Any bona fide disagreement over the application or enforcement of such a contract will permit

16

the Commission to dodge its responsibilities under subsections (5) and (5.5). This isn't what the legislature had in mind.

## IV. Conclusion

¶73    The chart below highlights how the majority misapprehends the jurisdictional exclusion in subsections (5) and (5.5) (i.e., the provisions in subsections (5) and (5.5) divesting the Commission of jurisdiction when there is a bona fide dispute over the interpretation of a contract):

| *The Legislature's Edict on the Jurisdictional Exclusion in Subsections (5) and (5.5)* | *The Majority's Holding on the Jurisdictional Exclusion in Subsections (5) and (5.5)* |
|---|---|
| ► **There must be a bona fide dispute over the interpretation of a contract.** | ► **There must be a bona fide dispute over the interpretation, application, or enforcement of a contract.** |
| ► **Simply reading a contract to determine whether it's ambiguous does not trigger the jurisdictional exclusion; the Commission is divested of jurisdiction only if there is a bona fide dispute over the interpretation of a contract.** | ► **Simply reading a contract to determine whether it's ambiguous triggers the jurisdictional exclusion; any bona fide dispute over the interpretation, application, or enforcement of a contract divests the Commission of jurisdiction.** |

¶74    I cannot join my colleagues in the majority because I don't believe their opinion adheres to the plain language of subsections (5) and (5.5). Rather than stop the Commission from skirting its responsibilities, the majority's overbroad opinion gives it almost unfettered power to do just that. Regrettably, our district courts will now have to pick up the slack.

17

¶75 Accordingly, I respectfully dissent. The division shouldn't have second-guessed the district court judges, and the majority shouldn't have followed suit.

I am authorized to state that JUSTICE HOOD and JUSTICE BERKENKOTTER join in this dissent