The summaries of the Colorado Court of Appeals published opinions constitute no part of the opinion of the division but have been prepared by the division for the convenience of the reader. The summaries may not be cited or relied upon as they are not the official language of the division. Any discrepancy between the language in the summary and in the opinion should be resolved in favor of the language in the opinion.

SUMMARY
March 7, 2024

## 2024COA25

**No. 23CA0073, *Hobbs v. City of Salida* — Public Health and Environment — Noise Abatement — Maximum Permissible Noise Levels — Preemption; Municipal Law — Noise Ordinances**

The division addresses, for the first time in a published opinion, the interplay between the general noise standards set by Colorado's Noise Abatement Act (Act), *see* §§ 25-12-101 to -110, C.R.S. 2023, and noise standards authorized through amplified noise permits issued by local governmental entities. The majority concludes that the plain language of section 25-12-103(11) provides municipal entities, such as the City of Salida, with the authority to issue amplified noise permits to private entities to hold cultural, entertainment, athletic, or patriotic events, including, but not limited to, concerts and music festivals on the permittee's property.

The dissent argues that the plain text of section 25-12-103(11), considered in context, and, alternatively, the legislative history of that section, mandate a conclusion that the exemption only authorizes a political subdivision of the state, such as a municipality, to issue amplified noise permits to entities which will use property that is used by that municipality.

COLORADO COURT OF APPEALS     **2024COA25**

Court of Appeals No. 23CA0073
Chaffee County District Court No. 22CV30020
Honorable Dayna Vise, Magistrate

Matthew K. Hobbs,

Plaintiff-Appellant and Cross-Appellee,

v.

City of Salida and Drew Nelson, in his official capacity as City of Salida
Administrator,

Defendants-Appellees,

and

Giant Hornet LLC, d/b/a HighSide! Bar and Grill,

Defendant-Appellee and Cross-Appellant.

_____

JUDGMENT AFFIRMED

Division III
Opinion by JUDGE SCHUTZ
Hawthorne*, J., concurs
J. Jones, J., dissents

Announced March 7, 2024

_____

Mathew K. Hobbs, Salida, Colorado, for Plaintiff-Appellant and Cross-Appellee

Wilson Williams LLP, Geoffry T. Wilson, Erica Romberg, Louisville, Colorado,
for Defendants-Appellees City of Salida and Drew Nelson

Anderson Law Group, Thomas H. Wagner, Salida, Colorado, for Defendant-
Appellee and Cross-Appellant

*Sitting by assignment of the Chief Justice under provisions of Colo. Const. art. VI, § 5(3), and § 24-51-1105, C.R.S. 2023.

¶ 1     Plaintiff, Matthew K. Hobbs, appeals the district court's order entering judgment as a matter of law in favor of the defendants, Giant Hornet LLC, d/b/a High Side! Bar and Grill (High Side), and the City of Salida and its administrator, Drew Nelson (collectively, Salida).  In resolving the parties' contentions, we address for the first time in a published opinion the interplay between general noise standards set by Colorado's Noise Abatement Act (Act), *see* §§ 25-12-101 to -110, C.R.S. 2023, and noise standards authorized through permits issued by local governmental entities.

¶ 2     We conclude that the amplified noise permits that Salida issued to High Side do not conflict with the Act.  Accordingly, we conclude that the district court correctly entered judgment as a matter of law in favor of Salida and High Side and against Hobbs.

## I.     Background

¶ 3     Salida is a statutory city located along the Arkansas River.  It was the first municipality in Colorado to form a creative arts district, which supports vibrant art and live music venues downtown.  *See generally* § 24-48.5-314(1)(a)(I), C.R.S. 2023 ("A creative district is a well-recognized, designated mixed-use area of a community in which a high concentration of cultural facilities,

1

creative businesses, or arts-related businesses serve as the anchor of attraction.").

¶ 4     Hobbs owns a home just north of the Arkansas River across from downtown Salida.  His southern property line is approximately 570 feet from High Side's outdoor patio.  Between High Side and Hobbs's home, which is located in an industrial zone, are a developed walking path, the Arkansas River, a railroad line, and a county road.  Hobbs is an attorney and often works from home in the evenings.

¶ 5     High Side opened in August 2020, during the COVID-19 pandemic.  The bar and restaurant routinely featured a variety of live musicians.  During the summer, it sponsored outdoor concerts on its patio, which abuts the edge of the walking path located along the southwestern bank of the Arkansas River.

¶ 6     Salida adopted an ordinance authorizing it to issue amplified noise permits, which allow local businesses to hold "special events or activities, including, without limitation, musical performances or other entertainment events, fireworks displays, parades and seasonal commercial activities."  Salida Mun. Code § 10-90-80(a).  Pursuant to the ordinance, no noise is permitted in excess of 85

2

db(A)[1] and the authorized activity must end at 10 p.m. absent prior special approval from the city.

¶ 7 Salida's amplified sound permits allow the permittee to hold musical events between May 2 and October 31. Absent circumstances not present here, Salida may issue no more than sixty permits per season to the same permittee. Thus, during a typical season, a permittee could hold approximately three outdoor musical events per week. In 2022, Salida issued amplified sound permits to a total of thirty-nine applicants within the community.

¶ 8 The Act generally limits the sound level for residential neighborhoods to 50 db(A) between 7 p.m. and 7 a.m. § 25-12-103(1), C.R.S. 2023. But Salida and High Side contend that the Act also authorizes cities to issue amplified sound permits. *See* § 25-12-103(11).

---

[1] A db(A) is a weighted scale that is measured with a sound meter using the A-Weighting network. § 25-12-102(2), C.R.S. 2023. The Centers for Disease Control and Prevention state that sounds that are 85 db(A) require an individual to raise their voice to be heard by someone who is three feet away. Ctrs. for Disease Control & Prevention, Nat'l Inst. for Occupational Safety & Health, *Noise and Occupational Hearing Loss*, https://perma.cc/PT34-5X9U. For example, printing presses, lawn mowers, and power tools produce noise levels between 85 and 90 db(A). *Id.*

¶ 9     On August 17, 2021, Hobbs filed a noise complaint with Salida, asserting that the decibel level emanating from concerts on High Side's patio exceeded the statewide limit. He alleged that High Side had held multiple events throughout the summer that were excessively loud. Shortly before contacting Salida, Hobbs monitored noise levels coming from High Side with a smart phone application. According to Hobbs, he measured noise levels on his property in the range of 51-78 db(A) between 7 and 9:30 p.m.

¶ 10     Over the next several months, Hobbs, High Side, and Salida worked informally to address Hobbs's concerns. The parties did not reach a mutually acceptable resolution.

¶ 11     In February 2022, Salida considered revisions to its amplified noise ordinance. Salida received comments from Hobbs and numerous other citizens. After considering the public's input and staff recommendations, Salida amended its ordinance to increase the available number of amplified sound permits from eighteen to sixty events per location.

¶ 12     That summer, Hobbs filed a complaint naming Salida and High Side as defendants. Hobbs requested the entry of a declaratory judgment that the Act preempts Salida's sound

4

amplification ordinance and, therefore, the sound amplification permits issued to High Side were null and void. The complaint also sought injunctive relief prohibiting Salida from issuing permits pursuant to the amplified sound ordinance and prohibiting High Side from hosting concerts that exceed the general limits set by the Act.

¶ 13 In response to Hobbs's complaint, Salida and High Side filed separate, but nearly identical, combined motions to dismiss for failure to join indispensable parties and for judgment as a matter of law on Hobbs's claim for declaratory relief. The district court denied the motions to dismiss for failure to join necessary parties. But the court granted Salida's and High Side's motions for judgment on the pleadings, concluding that Hobbs's claims fail as a matter of law.

¶ 14 Hobbs appeals the district court's entry of judgment on the pleadings. High Side cross-appeals the district court's denial of its motion to dismiss for failure to join necessary parties. Because we determine it is dispositive, we first address the district court's entry of judgment on the pleadings in favor of Salida and High Side.

## II. The Act Does Not Preempt Salida's Ordinance

¶ 15    Hobbs contends that the district court incorrectly concluded that section 25-12-103(11) allows Salida to issue amplified noise permits and instead argues that section 25-12-108, C.R.S. 2023, preempts Salida's ability to issue any sound permits that exceed the limitations set forth in the Act.

### A. Applicable Law and Standard of Review

¶ 16    The district court determined that the entry of judgment in the defendants' favor was appropriate because Hobbs's claims failed as a matter of law but noted that dismissal was also appropriate under C.R.C.P. 12(b)(5) for the same reasons. *See Hess v. Hobart*, 2020 COA 139M2, ¶ 33 n.5 (noting that supreme court precedent states that the entry of judgment is appropriate when a declaratory judgment claim fails as a matter of law, but affirming dismissal of such claims against the plaintiff because the effect was the same).

¶ 17    We conclude that "in a declaratory judgment action in which the court rules against the position of the plaintiff, it should enter a declaratory judgment and not sustain a motion to dismiss." *Karsh v. City & Cnty. of Denver*, 176 Colo. 406, 409-10, 490 P.2d 936, 938

(1971).  Thus, we review the district court's order to determine whether the entry of judgment against Hobbs was appropriate.

¶ 18     A district court may enter judgment in the defending party's favor if the material facts are not in dispute and the plaintiff's claim fails as a matter of law.  *See Tomar Dev., Inc. v. Friend*, 2015 COA 73, ¶ 24 (approving dismissal of declaratory judgment claims that fail as a matter of law).  No party is contending that any of the facts relevant to the district court's judgment were disputed.  Thus, the sole question before us is a question of law: whether the Act preempts Salida's ordinances and therefore renders void the permits Salida issued to High Side.  *See* §§ 25-12-101 to -110.

¶ 19     We review issues of statutory interpretation de novo.  *Nieto v. Clark's Mkt., Inc.*, 2021 CO 48, ¶ 12.  In interpreting a statute, our primary goal is to ascertain and give effect to the General Assembly's intent.  *See Elder v. Williams*, 2020 CO 88, ¶ 18.  First, we look at the statute's plain language, reading words and phrases in context and construing them according to the rules of grammar, syntax, and common usage.  *Broomfield Senior Living Owner, LLC v. R.G. Brinkmann Co.*, 2017 COA 31, ¶ 17.  If the statute's meaning is clear from the language alone, our analysis is complete, and we

apply the statute as written. *See OXY USA Inc. v. Mesa Cnty. Bd. of Comm'rs*, 2017 CO 104, ¶ 16.

¶ 20    When interpreting a statute, we generally avoid a construction "that would render any words or phrases superfluous or lead to illogical or absurd results." *Cowen v. People*, 2018 CO 96, ¶ 31 (quoting *Am. Fam. Mut. Ins. Co. v. Barriga*, 2018 CO 42, ¶ 8). But these canons do not enable us to rewrite a statute to achieve a different result than that dictated by the legislature's selected language. *People v. Bice*, 2023 COA 98, ¶ 32. Thus, "courts must approach rejecting a statute's plain language to avoid creating an absurd result very cautiously." *Oracle Corp. v. Dep't of Revenue*, 2017 COA 152, ¶ 41 ("[T]he absurd results 'rule' of construction typically is merely 'an invitation to judicial lawmaking.'" (quoting *Barrow v. City of Detroit Election Comm'n*, 836 N.W.2d 498, 506 (Mich. Ct. App. 2013))), *aff'd*, 2019 CO 42.

¶ 21    The absence of a statutory definition does not create ambiguity if the undefined phrase is one of common usage and the court can discern its usual and ordinary meaning. *Dillabaugh v. Ellerton*, 259 P.3d 550, 552 (Colo. App. 2011). When assessing whether a word or phrase has more than one reasonable meaning and is therefore

ambiguous, we must also consider the meaning of the word or phrase in the context of the statutory language. *Dep't of Transp. v. Amerco Real Est. Co.*, 2016 CO 62, ¶ 12. Words and phrases cannot be separated from the broader context and the way they are used in the sentence in which they appear. *Id.*

¶ 22 Under the doctrine of *noscitur a sociis*, a word or phrase is known by the company it keeps. *St. Vrain Valley Sch. Dist. RE-1J v. A.R.L.*, 2014 CO 33, ¶ 22; *see also Gustafson v. Alloyd Co.*, 513 U.S. 561, 575 (1995). We rely on this rule to avoid ascribing a meaning to one word that is inconsistent with its accompanying words. *Gustafson*, 513 U.S. at 575.

## B. The Act

¶ 23 In 1971, the General Assembly adopted the Act to establish standards regulating the degree of noise pollution in Colorado:

> The general assembly finds and declares that noise is a major source of environmental pollution which represents a threat to the serenity and quality of life in the state of Colorado. Excess noise often has an adverse physiological and psychological effect on human beings, thus contributing to an economic loss to the community. Accordingly, it is the policy of the general assembly to establish statewide standards for noise level limits for various time periods and areas.

9

Noise in excess of the limits provided in this article constitutes a public nuisance.

§ 25-12-101. Section 25-12-103(1) sets forth Colorado's general noise abatement standards:

Every activity to which this article is applicable shall be conducted in a manner so that any noise produced is not objectionable due to intermittence, beat frequency, or shrillness. Sound levels of noise radiating from a property line at a distance of twenty-five feet or more therefrom in excess of the db(A) established for the following time periods and zones shall constitute prima facie evidence that such noise is a public nuisance:

| Zone | 7:00 a.m. to next 7:00 p.m. | 7:00 p.m. to next 7:00 a.m. |
|------|------|------|
| Residential | 55 db(A) | 50 db(A) |
| Commercial | 60 db(A) | 55 db(A) |
| Light industrial | 70 db(A) | 65 db(A) |
| Industrial | 80 db(A) | 75 db(A) |

§ 25-12-103(1). Hobbs points to this section to support his claim that Salida's noise amplification ordinance, and the related permits Salida issued to High Side, conflict with state law. Hobbs argues that the conflicting noise ordinance is preempted by section 25-12-108, which provides that "this article shall not be construed to

10

preempt or limit the authority of any municipality or county to adopt standards that are no less restrictive than the provisions of this article."

¶ 24    In contrast, Salida and High Side argue that Salida's ordinance and the subject permits are exempted from the Act's general standards based on the following language, which the General Assembly added to the Act through an amendment in 1987:

> This article is not applicable to the use of property by this state, any political subdivision of this state, or any other entity not organized for profit, including, but not limited to, nonprofit corporations, or any of their lessees, licensees, or permittees, for the purpose of promoting, producing, or holding cultural, entertainment, athletic, or patriotic events, including, but not limited to, concerts, music festivals, and fireworks displays. This subsection (11) shall not be construed to preempt or limit the authority of any political subdivision having jurisdiction to regulate noise abatement.

§ 25-12-103(11).

¶ 25    Generally, a local ordinance that conflicts with a state statute is void; however, contrary provisions in an ordinance and a state statute do not necessarily indicate a conflict. *Minch v. Town of*

11

*Mead*, 957 P.2d 1054, 1056 (Colo. App. 1998). If possible, ordinances and statutes must be reconciled, and effect should be given to both. *Id.*

¶ 26    In entering judgment against Hobbs, the district court reconciled the Act with Salida's ordinance and resulting permits, reasoning that the Act unambiguously exempts Salida's actions: "[T]he plain language of section 25-12-103(11) clearly states the legislative intent that the noise level limits established in the statute do not apply to political subdivisions or their permittees when holding music and cultural events."

## C.    Analysis

¶ 27    Hobbs does not dispute, and we agree, that Salida is a political subdivision of the state. *See, e.g.*, § 29-1-202(2), C.R.S. 2023 (defining "political subdivision" to mean "a county, city and county, city, town, service authority, school district, local improvement district, . . . or any other kind of municipal, quasi-municipal, or public corporation organized pursuant to law"). Nor does he dispute that High Side is a permittee of Salida, or that musical concerts are one of the activities contemplated by the statutory exception. But Hobbs argues that the exemption language of

12

section 25-12-103(11) applies only to concerts that occur, as relevant here, on property used by a city, or a city's permittees using property owned by the City. Therefore, Hobbs argues, section 25-12-103(11) does not authorize Salida to issue amplified sound permits to for-profit entities such as High Side to hold concerts on private property.

¶ 28 In response, High Side and Salida argue that the exemption contemplated by section 25-12-103(11) is not limited to concerts performed on property Salida owns, but rather applies to all property for which a permit is issued. Additionally, High Side and Salida argue that the ordinance is not limited to concerts or musical festivals performed by nonprofit entities, but rather extends to Salida's permittees, whether they conduct business for profit or otherwise. Based on these premises, Salida and High Side argue that the ordinance and resulting permits are authorized by the Act and that Hobbs's preemption argument fails as a matter of law.

¶ 29 We address the parties' differing interpretations in turn.

## 1. The Exemption Is Not Limited to Concerts Performed on Land Owned by Salida

¶ 30 We agree with Salida and High Side that section 25-12-103(11) is not ambiguous. We also agree that its clear language authorized Salida to issue the disputed permits to High Side.

¶ 31 Hobbs points to the following language: "This article is not applicable to the *use of property by* . . . any political subdivision of this state, . . . or any of [its] . . . permittees, for the purpose of . . . holding . . . concerts." § 25-12-103(11) (emphasis added). Hobbs seizes on the "use of property by . . . any political subdivision" language to argue that permits may only authorize concerts on property Salida owns. But the statute contains no such limitation.

¶ 32 The statute does not contain any limitation, express or implied, that a political subdivision may only authorize permits for performances on land it owns. Rather, the statute refers broadly to the "use of property" without any restriction with respect to who owns the property. And the permitted property users include the political subdivision's permittees. Surely, if the legislature had intended for the exemption to only apply to events held on land owned by the state, its political subdivisions, or nonprofit entities, it

14

knew how to say that.  *See, e.g., People v. Griffin*, 397 P.3d 1086, 1089 (Colo. App. 2011) ("If the legislature had wanted offenders to register where they merely intend to reside, it certainly knew how to say so.").  But it did not.

¶ 33    We presume the General Assembly acts intentionally when selecting the words used in a statute.  *See, e.g., People v. O'Neal*, 228 P.3d 211, 213 (Colo. App. 2009) (we presume the General Assembly did not use language idly).  We do not add to, or subtract from, the words chosen by the General Assembly.  *Nieto*, ¶ 12.  And if the statutory language is clear, we must apply it as written.  *Denver Post Corp. v. Ritter*, 255 P.3d 1083, 1089 (Colo. 2011).  Section 25-12-103(11) has no words restricting the issued permits use to the issuing political subdivision's property.  Thus, we conclude the district court did not err by rejecting Hobbs's argument that the authorized permits are restricted to property owned by Salida.

2.    Section 25-12-103 Does Not Preclude Issuing Permits to For-Profit Entities.

¶ 34    Hobbs also argues that section 25-12-103(11) only authorizes Salida to issue permits to nonprofit entities.  Specifically, he argues

15

that by not applying such a restriction, the district court failed to give effect to the statute's nonprofit language. We disagree.

¶ 35 As Hobbs correctly notes, just as we may not add words to a statute, neither may we ignore the words selected by the General Assembly. *Nieto*, ¶ 12. Relying on this principle, Hobbs argues that the district court ignored the phrase "or any other entity not organized for profit, including, but not limited to, nonprofit corporations." § 25-12-103(11). Hobbs contends that this language dictates a conclusion that a political subdivision may only issue amplified sound permits to nonprofit entities, but not for-profit entities like High Side. But that is not what the statute's plain language says.

¶ 36 The statute applies broadly to the state, its political subdivisions, and nonprofit entities. But the statute also applies to "any of their lessees, licensees, or permittees." § 25-12-103(11). The statute does not limit or define what type of entities fall within the permittee's status. More specifically, it does not provide that only nonprofit entities may be issued permits. And for the reasons previously stated, we may not add such words. *See Nieto*, ¶ 12.

¶ 37 Contrary to Hobbs's argument, this construction of the statute does not ignore or fail to give effect to the phrase "or any other entity not organized for profit, including, but not limited to, nonprofit corporations." That language exempts nonprofit entities from the Act's noise standards.

¶ 38 Though not clearly expressed by Hobbs, we also reject any implicit argument that the phrase "any of their lessees, licensees, or permittees" modifies only the immediately preceding phrase referring to nonprofit entities. Permits are defined as "a written warrant or license granted by one having authority." Merriam-Webster Dictionary, https://perma.cc/56QE-RDR6; *see also* Black's Law Dictionary 1376 (11th ed. 2019) (defining permittee as "[s]omeone who has permission to do something"). Permits are commonly issued by governmental entities, such as the state or its political subdivisions. Licenses are also frequently issued by the state or its political subdivisions. A licensee is defined as "[o]ne to whom a license is granted: someone who has official permission to do something." Black's Law Dictionary at 1105.

¶ 39 Applying *noscitur a sociis*, which gives phrases meaning by looking at the words and phrases that surround them, and by

17

utilizing traditional grammatical conventions and syntax, we conclude that the phrase "any of their lessees, licensees, or permittees" modifies each of the preceding entities: the state, political subdivisions of the state, and nonprofit entities. *See St. Vrain*, ¶ 22; *see also Est. of David v. Snelson*, 776 P.2d 813, 818 (Colo. 1989) ("When a referential or qualifying clause follows several words or phrases and is applicable as much to the first word or phrase as to the others in the list, . . . the clause should be applied to all of the words or phrases that preceded it.").

¶ 40    The primary definition of both licensee and permittee is someone who has been granted permission to do something. Although both terms are also sometimes used in the real estate context, their primary definition relates to the receipt of official permission to engage in some type of activity. *See, e.g.*, § 44-4-103(2), C.R.S. 2023 ("'License' means a grant to a licensee to sell fermented malt beverages or fermented malt beverages and wine at retail . . . ."); § 24-21-602(25), C.R.S. 2023 ("'License' means any license or certification issued by the licensing authority" to operate bingo or raffle games.); § 13-51.5-102(1), C.R.S. 2023 ("'Development permit' means any zoning permit, subdivision

approval, certification, special exception, variance, or any other similar action of a governmental entity that has the effect of authorizing the development of real property."); § 42-1-232(1)(c), C.R.S. 2023 ("'Permit' means authority for an organization to employ people to verify information . . . that may be required to register a commercial vehicle . . . .").

¶ 41    Particularly in the regulation of noise emissions, the term "permit" is frequently used to refer to the authority a local entity grants to exceed a particular noise limit. *See, e.g.*, Salida Mun. Code § 10-9-80(a) ("A permit to vary or temporarily waive the maximum allowable noise levels as specified in this Article may be applied for and obtained from the City . . . ."); City of Wheat Ridge, *Amplified Sound Event Permit Application*, https://perma.cc/B67F-8M58 ("No outdoor amplified sound event permit may be issued for an event outside of the hours of 9:00 a.m. and 9:00 p.m. Sunday through Thursday, and 9:00 a.m. and 10:00 p.m. Friday and Saturday. Within this time range, outdoor amplified sound events may be limited in duration as determined by the approving authority."); Colo. Springs Mun. Code § 9.8.109 ("Applications for a permit, for other than vehicular traffic, for relief from the noise level

19

designated in this part on the basis of undue hardship may be made to the Mayor.  Any permit granted by the Mayor shall contain all conditions upon which the permit has been granted and shall specify a reasonable time for which the permit shall be effective.").

¶ 42     We acknowledge that the word "lessee" typically refers to a leasehold interest in real estate.  But that does not limit or qualify the typical meaning of licensees or permittees.  The use of the word lessees nevertheless serves an important function under 25-12-103(11).  It extends the exemption to those who lease property from a state, its political subdivisions, and other nonprofit entities, provided the lessees comply with the applicable permitting process of the local jurisdiction in which the property is located.

### 3.     The Act Does Not Preempt Salida's Sound Amplification Ordinance

¶ 43     Hobbs's reliance on the preemption language of section 25-12-108 is also misplaced.  Section 25-12-103(11) expressly states that the Act is "not applicable to the use of property by . . . any political subdivision of this state, . . . or any of [its] . . . permittees."  Thus, the Act's noise standards are not applicable to Salida or its

permittee — High Side. Accordingly, the preemption language of section 25-12-108 also does not apply to the present dispute.

### 4. Legislative History

¶ 44 Finally, we acknowledge that Hobbs argues the district court's statutory construction is inconsistent with the Act's legislative history or the amendment that created section 25-12-103(11). But where, as here, the statute's language is clear and unambiguous, it is neither necessary nor appropriate to resort to legislative history to interpret the statute.[2] *See, e.g., Smith v. Exec. Custom Homes, Inc.*, 230 P.3d 1186, 1189 (Colo. 2010). Rather, we apply the statute as written. *Id.*

---

[2] Similarly, the amendment's title is irrelevant absent a statutory ambiguity. As the supreme court recently explained,

> [A] title cannot limit the plain meaning of a more specific provision within a statute. *See Whitman v. Am. Trucking Ass'ns*, 531 U.S. 457, 483 (2001). Instead, the title is useful for purposes of statutory interpretation only when it "shed[s] light on some ambiguous word or phrase in the statute itself." *Id.* (alteration omitted) (quoting *Carter v. United States*, 530 U.S. 255, 267 (2000)).

*Arvada Vill. Gardens LP v. Garate*, 2023 CO 24, ¶ 14.

21

¶ 45    Even if we were to conclude that the amendment is ambiguous, the legislative history does not support Hobbs's contention that the statutory exemption for permittees should be limited to events occurring on property owned by the state, its political subdivisions, or nonprofit entities.  As the dissent notes, the legislative history supports the conclusion that the amendment was prompted by a desire to ensure that the Act would not prohibit the development and use of Fiddler's Green Amphitheatre in Arapahoe County.  And it is also true that at various legislative hearings, there were references to performances held at other public venues, such as Folsom Field and the State Fair.

¶ 46    But the hearings contain no statements by any person that the amendment was intended to apply to permittees only if the permittees were using property owned by the state, its political subdivisions, or nonprofit entities.  Rather, Representative Schauer — the amendment's sponsor — stated unequivocally that "what [the amendment] does is provide the opportunity for that, on public or private property, . . . for cultural, entertainment, athletic, or patriotic events."  Hearing on H.B. 1340 before the H. Fin. Comm., 56th Gen. Assemb., 1st Reg. Sess. (Apr. 1, 1987).  Obviously,

private property does not include property owned by the state or its political subdivisions. And Representative Schauer's reference to private property was not restricted to property owned by nonprofit entities. To the contrary, this statement reflected the legislative intent that the amendment would apply to duly permitted uses on all public or private property.

¶ 47    We also reject Hobbs's contention that the district court's interpretation of the statute leads to an absurd result because it renders the Act completely ineffectual. We disagree. The Act applies to all areas of Colorado except those that the General Assembly has expressly excluded from its application. And, of course, the exception created by section 25-12-103(11) is limited to "cultural, entertainment, athletic, or patriotic events, including, but not limited to, concerts, music festivals, and fireworks displays" that are duly permitted by the local jurisdiction. Thus, the Act continues to serve its laudatory purposes across the bulk of the state.

¶ 48    The legislative history makes clear that the amendment was intended to provide local governments with the flexibility and control to apply local standards to regulate cultural, entertainment,

athletic, or patriotic events, rather than subject these events to a statewide, unbending mandate. Indeed, local control was a central theme in the legislative hearings. When various legislators expressed concerns about the potential impact on adjacent landowners, Representative Groff stated that all the amendment does "is allow the local government to issue the permits and to issue what those noise standards would have to be in those particular open air concerts." 2d Reading on H.B. 1340 before the H., 56th Gen. Assemb., 1st Reg. Sess. (Apr. 13, 1987). As Representative Groff recognized, the final sentence of 25-12-103(11) maintains and reiterates the authority of counties, cities, and towns to regulate noise issues within their jurisdictions: "This subsection shall not be construed to preempt or limit the authority of any political subdivision having jurisdiction to regulate noise abatement."

¶ 49    The legislature's foresight also alleviates the parade of absurdities envisioned by Hobbs and the dissent. Our interpretation of the statute does not enable nonprofit entities to issue noise permits that exceed the statewide limit. This argument conflates the limited exemption granted by section 25-12-103(11)

with a grant of authority to issue amplified noise permits. Political subdivisions of the state — counties, cities, and towns — control the issuance of amplified noise permits, a reality that section 25-12-103(11) recognizes.

¶ 50    Thus, the forecasted absurdities are not legally possible because notwithstanding the exemption created by section 25-12-103(11), the amendment does not allow doctors, lawyers, or those who hold a driver's license to exceed the applicable noise limits. To the contrary, the last sentence of the amendment preserves "the authority of any political subdivision having jurisdiction to regulate noise abatement." § 25-12-103(11).

¶ 51    Finally, the General Assembly's decision to defer to the discretion of local governmental entities in setting noise levels does not leave the public without a remedy. Concerned residents, such as Hobbs and other interested parties, were allowed to participate in the amendment process. Based on their concerns, Salida's elected officials modified the sound amplification ordinances in a manner that they thought best met the needs of Salida's residents. The fact that such a remedy does not always lead to the particular

result desired by a particular party does not mean that the statute, or the political process that it contemplates, is absurd.

¶ 52     We perceive no error in the district court's conclusion that Hobbs's claims failed as a matter of law.

### III.   Necessary Parties

¶ 53     High Side argued, in the alternative, that the district court erred by denying its motion to dismiss for failure to join necessary parties. Because we have concluded that the district court correctly entered judgment in High Side's and Salida's favor under section 25-12-103(11), we do not need to address High Side's alternative argument. Thus, we express no opinion whether other parties holding noise permits were necessary parties to Hobbs's claims.

### IV.   Attorney Fees

¶ 54     Both Salida and High Side request an award of attorney fees against Hobbs. Neither of them, however, cites any legal authority or develops any argument in support of its requests. We therefore decline to further address their claims. *See* C.A.R. 39; *Foster v. Plock*, 2016 COA 41, ¶ 63.

¶ 55     Hobbs requests an award of attorney fees against Salida and High Side, asserting that their arguments for declaratory relief

based on section 25-12-103(11) were frivolous and groundless, and that High Side's argument for dismissal based on the failure to join indispensable parties was also frivolous and groundless. Because Hobbs develops this request with citations to authority and argument, we address it on the merits.

## A. Applicable Law

¶ 56 Section 13-17-102, C.R.S. 2023, provides that a court shall award attorney fees against any party who has defended a civil action, in whole or in part, that lacked substantial justification. § 13-17-102(2), (4). As used in the statute, the phrase "lacked substantial justification' means substantially frivolous, substantially groundless, or substantially vexatious." *Id.*

¶ 57 A defense is substantially frivolous if "the proponent can present no rational argument based on the evidence or law in support of [it]." *Mulberry Frontage Metro. Dist. v. Sunstate Equip. Co.*, 2023 COA 66, ¶ 42 (alteration in original) (quoting *City of Aurora v. Colo. State Eng'r*, 105 P.3d 595, 620 (Colo. 2005)). A defense is substantially groundless if it is not supported by any credible evidence. *Id.* (citing *City of Aurora*, 105 P.3d at 618). A

defense is substantially vexatious if it is brought or maintained in bad faith or to annoy or harass another. *Id.*

### B. Application

¶ 58 Contrary to Hobbs's assertion, Salida's and High Side's motions to dismiss were not substantially frivolous, groundless, or vexatious. Indeed, we have affirmed the district court's conclusion that Salida and High Side are entitled to judgment as a matter of law on all of Hobbs's claims. And although we did not need to resolve the merits of High Side's necessary parties defense, we are satisfied that the defense did not lack substantial justification.

¶ 59 Accordingly, we reject Hobbs's request for an award of attorney fees against Salida and High Side.

### V. Disposition

¶ 60 The district court's judgment is affirmed.

JUDGE HAWTHORNE concurs.

JUDGE J. JONES dissents.

JUDGE J. JONES, dissenting.

¶ 61　　The City of Salida gave High Side! Bar and Grill (High Side), a privately owned, for-profit food and beverage establishment, permits to exceed noise limits established by section 25-12-103, C.R.S. 2023, despite the fact Salida doesn't have any property interest in the property on which High Side operates. The majority concludes that Salida has the authority to issue such permits under section 25-12-103(11). Because I disagree with that conclusion, and because I conclude that the district court didn't err by declining to dismiss Matthew Hobbs' complaint for failure to join indispensable parties (an issue High Side raises on cross-appeal), I respectfully dissent.

## I.　Background

¶ 62　　The General Assembly has declared that "noise is a major source of environmental pollution which represents a threat to the serenity and quality of life in the state of Colorado." § 25-12-101, C.R.S. 2023. So it established "statewide standards," *id.*, for noise limits, which can be found in section 25-12-103. The highest such

noise limit is 80 db(A).[3]  That limit applies only to "[i]ndustrial" zones, and only then between the hours of 7 a.m. and 7 p.m.  § 25-12-103(1).[4]

¶ 63    The permits Salida issued to High Side allowed noise up to 85db(A) at nighttime, when the limit at High Side, a commercial establishment, would otherwise be 55 db(A).  *See id.*[5]  This would seem to run afoul of sections 25-12-101, 25-12-103(1), and 25-12-108, C.R.S. 2023, the latter of which says that nothing in title 25, article 12 shall "be construed to preempt or limit the authority of any municipality or county to adopt standards that are *no less restrictive* than the provisions of [title 25, article 12]."  (Emphasis added.)  In other words, a municipality like Salida may adopt noise-level standards that are more restrictive than the state standards, but not standards that are less restrictive than the state standards: the state statutory standards for noise levels are the ceilings.

---

[3] Section 25-12-102(3), C.R.S. 2023, describes this "decibel" unit of noise measurement.

[4] During the hours between 7 a.m. and 7 p.m., noise may exceed the usual limit by 10 db(A) for no more than fifteen minutes of each hour.  § 25-12-103(2), C.R.S. 2023.

[5] As discussed in section 25-12-102(3), such a 30 db(A) difference is, to put it mildly, substantial.

¶ 64    But that brings us to section 25-12-103(11), which exempts some entities from the statewide standards. It provides as follows:

> This article is not applicable to the use of property by this state, any political subdivision of this state, or any other entity not organized for profit, including, but not limited to, nonprofit corporations, or any of their lessees, licensees, or permittees, for the purpose of promoting, producing, or holding cultural, entertainment, athletic, or patriotic events, including, but not limited to, concerts, music festivals, and fireworks displays. This subsection (11) shall not be construed to preempt or limit the authority of any political subdivision having jurisdiction to regulate noise abatement.

¶ 65    The majority concludes that High Side qualifies as a "permittee" of a "political subdivision of this state" under this exemption simply because Salida gave High Side permits to exceed the statewide statutory noise limits. With respect, that construction of section 25-12-103(11) fails to account for that section's language as a whole and that of the related statutory scheme, renders language in that section superfluous, leads to illogical and absurd results, and is inconsistent with the statute's legislative history.

## II. Hobbs' Appeal

### A. Standard of Review and Applicable Law

¶ 66    We review questions of statutory interpretation de novo. *Edwards v. New Century Hospice, Inc.*, 2023 CO 49, ¶ 14.

¶ 67    Our primary task in interpreting a statute is to give effect to the General Assembly's intent. *Id.* To determine that intent, we first look to the plain and ordinary meanings of the words and phrases used in the statute. *Krol v. CF & I Steel,* 2013 COA 32, ¶ 15. But we do so considering those words and phrases "in the dual contexts of the statute as a whole and the comprehensive statutory scheme, giving consistent, harmonious, and sensible effect to all of the statute's language." *Id.* And "[w]e must avoid any constructions that would render any words or phrases superfluous or that would lead to illogical or absurd results." *Dep't of Revenue v. Agilent Techs., Inc.,* 2019 CO 41, ¶ 16.

¶ 68    If, after applying these principles, we conclude that the language is susceptible of but one reasonable interpretation, we stop there and enforce the statute as written. *Antero Res. Corp. v. Airport Land Partners, Ltd.,* 2023 CO 13, ¶ 13. But if we conclude that the statute is susceptible of multiple reasonable interpretations

— that is, it is ambiguous — then we may look to other indicators of legislative intent, such as the object sought to be obtained, the legislative history, the consequences of a particular construction, and the legislative declaration of purpose. § 2-4-203, C.R.S. 2023; *see State v. Nieto*, 993 P.2d 493, 501 (Colo. 2000).

## B. Analysis

¶ 69 As I see it, the majority's reasoning falters most fundamentally by failing to read the statutory language as a whole. The majority construes the term "permittees" in isolation, without considering the language preceding it. *See Lewis v. Taylor*, 2016 CO 48, ¶ 20 (we don't read statutory words in isolation, but in context). Subsection (11) begins by saying article 12 isn't applicable to "the use of property" by three types of entities — the state, political subdivisions of the state, and "any other entity not organized for profit." It then identifies three subcategories of property users — "their lessees, licensees, and permittees" — for each of the three categories of not-for-profit property users.[6] § 25-12-103(11). But

---

[6] The subsection's use of the term "their" clearly refers to the state, political subdivisions of the state, and other entities not organized for profit.

under the majority's construction of subsection (11), even though lessors, licensees, and permittees are *subcategories* of the state, political subdivisions of the state, and other entities not organized for profit (a proposition even High Side concedes),[7] the property they may use for the purposes identified in subsection (11) isn't limited to "property used by" the entities in the primary categories. In other words, the majority deems the statutory limitation to the "use of property" by entities in the three primary categories inapplicable to entities in the three subcategories. If that is what the General Assembly intended, it had a strange way of saying so. Indeed, that construction leads to absurd results.

¶ 70    The majority's construction would allow Salida to issue a "permit" to anyone — without limitation — to violate the statewide noise standards, without any limitation as to noise level, duration, or frequency, as long as the noise is caused by one of the statutorily

---

[7] "When a referential or qualifying clause follows several words or phrases and is applicable as much to the first word or phrase as to the others in the list, . . . the clause should be applied to all of the words or phrases that preceded it." *Est. of David v. Snelson*, 776 P.2d 813, 818 (Colo. 1989); *see* § 2-4-214, C.R.S. 2023 (abrogating the "last antecedent" rule, whereby qualifying phrases were deemed to apply only to the last antecedent to which they were closely connected).

identified events.  That result can't be squared with the purpose of the statute as expressed in section 25-12-101 and emphasized by the preemption provision, section 25-12-108.  And, more absurdly, that power would apply not only to the state and political subdivisions of the state — like Salida — but to "any other entity not organized for profit": any nonprofit entity, "including, but not limited to, nonprofit corporations," § 25-12-103(11), could issue a permit to anyone anywhere in the state to violate the statewide noise standards for the statutorily identified events — again, without any limitation as to noise level, duration, or frequency.

¶ 71     The majority's construction also fails to consider and give effect to all three subcategories of property users, in various ways.

¶ 72     First, no entity would give a *lease* to someone to exceed the statewide standards.  Yet, one subcategory of property users is "lessees" of the state, political subdivisions of the state, and any other entities not organized for profit.  The term obviously applies to those who lease property from one of those three categories of entities.  So any such lessee isn't subject to the statewide standards, and without any need for a license or permit; otherwise, "lessees" is redundant.  *See* § 2-4-201(1)(b), C.R.S. 2023 (we must

35

presume that "[t]he entire statute is intended to be effective");

*Wolford v. Pinnacol Assurance*, 107 P.3d 947, 951 (Colo. 2005) (we must avoid a statutory interpretation that renders any provision redundant or superfluous).

¶ 73     Second, the ramifications of the majority's interpretation of the term "permittees" on the adjacent term "licensees" are profound. If "licensees" is construed without regard to context — like the majority construes "permittees" — only two results, both seemingly impermissible, are possible: (1) anyone to whom the state or any of its political subdivisions has issued a license of any kind isn't subject to the statewide standards or (2) the state or any of its political subdivisions (and any other entity not organized for profit) may issue a license to anyone to exceed the statewide standards. The first result is absurd. Think of all the licenses issued by the state — licenses to practice law or medicine, for example, *or to drive*. The legislature could not have intended such licensees to be allowed to hold events excluded from the noise limitations. The second result renders "licensees" redundant of "permittees." After all, what would be the difference between a license to exceed the statewide standards and a permit to do so? This result, which the

majority adopts, *see supra* ¶ 40, violates the well-established canon of statutory construction that we presume the legislature means different things when it uses different words. *See Colo. Med. Bd. v. Off. of Admin. Cts.,* 2014 CO 51, ¶ 19 ("[T]he use of different terms signals the General Assembly's intent to afford those terms different meanings."); *Wolford,* 107 P.3d at 951.

¶ 74 The only way, then, to read the exception in subsection (11) in a sensible way that gives effect to all of its parts is to construe it as limited to property used by the state, political subdivisions of the state, and any other entity not organized for profit, and any other entity that uses property used by those three primary categories of entities — whether by lease, license, or permit.[8]

---

[8] A common definition of a "licensee" was, when section 25-12-103(11) was enacted, "a person who has a privilege to enter upon land arising from permission or consent, express or implied, of the possessor of land but who goes on the land for his own purpose rather than for any purpose or interest of the possessor." Black's Law Dictionary 830 (5th ed. 1979); *see also* § 13-21-115(5)(b), C.R.S. 1990 (defining "licensee" for purposes of the Premises Liability Act as "a person who enters or remains on the land of another for the licensee's own convenience or to advance his own interests, pursuant to the landowner's permission or consent"). This definition of licensee sensibly applies to the real property-focused exemption of section 25-12-103(11), particularly in light of the alternative meaning (e.g., a driver's license), which would be extraordinarily (indeed, absurdly) broad.

¶ 75    This interpretation is strongly — I would say conclusively —

supported by the legislative history of subsection (11).[9]  That

exception was added to section 25-12-103 in 1987.  The title of the

bill adding the exception was "AN ACT CONCERNING THE

EXEMPTION OF PROPERTY USED BY NOT FOR PROFIT ENTITIES

FOR PUBLIC EVENTS FROM STATUTORY MAXIMUM

PERMISSIBLE NOISE LEVELS."  Ch. 212, 1987 Colo. Sess. Laws

1154.[10]  This indicates that the exception was intended to apply

only to property used by not-for-profit entities.  *See City of Ouray v.*

*Olin*, 761 P.2d 784, 789 (Colo. 1988) (court may consider the title of

legislation in resolving uncertainties concerning legislative intent;

holding the title of the legislation there at issue — "[A]n act

concerning compensation of county employees" — indicated that it

was intended to apply only to county employees).

---

[9] If the statutory language doesn't clearly support my interpretation, it is at least ambiguous, justifying consideration of legislative history.  *See* § 2-4-203, C.R.S. 2023.

[10] All three categories of primary entities in subsection (11) are not-for-profit entities.  Recall, subsection (11) identifies those entities as "this state, any political subdivision of this state, or any *other* entity not organized for profit."  § 25-12-103(11) (emphasis added).

¶ 76    At hearings before House and Senate committees and in readings of the bill before the House and Senate, the bill's sponsors, Representative Schauer and Senator Bird, and other legislators, indicated the following:

- Representative Schauer told the House Finance Committee that the bill would apply to concerts at, for example, Washington Park in Denver and Fiddler's Green Amphitheatre.  Immediately after Representative Schauer explained that the bill would "provide the opportunity for, on public or private property, for cultural, entertainment, athletic, or patriotic events," Representative Groff, in a moment of levity, asked facetiously whether H.B. 1340 was "the Fiddler's Green Bill."  Everyone laughed. Representative Schauer confirmed that Fiddler's Green, which was in his district, was the impetus for the bill, and referred to Fiddler's Green as being owned by a "*private*, nonprofit facility."  (Emphasis added.)  Another representative mentioned fireworks at the State Fair Grounds in Pueblo.  Representative Thiebaut said it would allow the Air Force Academy Band to perform at

Memorial Park in Colorado Springs. Representative Schauer confirmed that the city could issue a "permit" for such a performance. Hearing on H.B. 1340 before the H. Fin. Comm., 56th Gen. Assemb., 1st Reg. Sess. (Apr. 1, 1987).

- During second reading of the bill in the House, Representative Schauer said the bill was intended to deal with "open air concerts that would be performed at any property, *whether that be state, city or county, or a nonprofit facility.*" 2d Reading on H.B. 1340 before the H., 56th Gen. Assemb., 1st Reg. Sess. (Apr. 13, 1987) (emphasis added).[11] The impetus for the bill was anticipated development at Fiddler's Green Amphitheatre in Arapahoe County (which, as noted, was owned by a private, nonprofit entity). Representative Schauer also mentioned Washington Park in Denver as a covered venue. Representative Groff also spoke about concerts at

---

[11] The majority opinion doesn't acknowledge this statement, which contradicts the majority's assertion that Representative Schauer didn't limit his references to private property to such property used by not-for-profit entities.

Washington Park, such as those given by the "Denver Symphony Orchestra," and said the bill would allow the city to "issue the permits" to allow performances at such places for "those particular open-air concerts." *Id.*[12]

- During a hearing before the Senate State Affairs Committee, Senator Bird said the bill would apply to venues such as Washington Park, Folsom Field at the University of Colorado in Boulder, and Fiddler's Green Amphitheatre. In response to a question by a committee member, Senator Bird said that the bill would allow for a for-profit rock concert at Folsom Field *because* Folsom Field is owned by a nonprofit entity (the state). Hearing on H.B. 1340 before the S. State Affairs Comm., 56th Gen. Assemb., 1st Reg. Sess. (Apr. 27, 1987).[13]

---

[12] Though the majority opinion relies on the statement by Representative Groff, it omits the first part of her statement, which was about "Denver Symphony Orchestra" concerts at Washington Park, a city-owned property. It was those concerts Representative Groff was clearly referring to when she mentioned "*those particular* open-air concerts." 2d Reading on H.B. 1340 before the H., 56th Gen. Assemb., 1st Reg. Sess. (Apr. 13, 1987) (emphasis added).

[13] The majority opinion does not acknowledge this statement.

- Senator Bird said at a reading of the bill in the Senate that it would apply to venues such as Fiddler's Green Amphitheatre and the State Fair Grounds in Pueblo (to allow for a concert by, for example, Willie Nelson). 2d Reading of H.B. 1340 before the S., 56th Gen. Assemb., 1st Reg. Sess. (Apr. 30, 1987).

¶ 77 To me, all of these statements indicate that the real property subject to the bill is limited to that real property used by the state, a political subdivision of the state, or any other not-for-profit entity. There was nary a mention during any hearing on or reading of the bill of potential applicability to private property not owned by a not-for-profit entity, such as High Side.

Therefore, I respectfully dissent from the majority's interpretation of section 25-12-103(11).

### III.  High Side's Cross-Appeal

¶ 78 High Side cross-appeals the district court's denial of its motion to dismiss for failure to join indispensable parties — specifically, thirty-eight other entities to which Salida has issued permits to exceed statewide noise standards. I would affirm that aspect of the district court's judgment.

42

¶ 79     *Accetta v. Brooks Towers Residences Condominium Ass'n*, 2019 CO 11, is the Colorado Supreme Court's most recent pronouncement on how courts should determine whether a nonparty is indispensable and must be joined. That case, like this one, was a declaratory judgment action. The court held that joinder isn't required when a present party adequately represents the interests of an absent party. In this case, Salida and High Side's interests are aligned with those of any other permittees such that they can be expected to have made the absent party's arguments, Salida and High Side are capable of and willing to make those arguments, and any absent permittee wouldn't offer any necessary element to the proceedings that Salida and High Side would neglect. *See id.* at ¶ 19. Therefore, the district court didn't err by refusing to dismiss Hobbs' complaint for failure to join indispensable parties.[14]

## IV.   Conclusion

¶ 80     In sum, I would reverse the judgment and remand for entry of appropriate declaratory and injunctive relief.

---

[14] I also observe that Salida issues its permits for very short periods of time. Those holding permits on a particular day change frequently, perhaps daily. This would make joinder as advocated by High Side a practical impossibility.